# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LTMC/DRAGONFLY, INC.,

    Plaintiff,

    v.

METROPOLITAN WASHINGTON
AIRPORTS AUTHORITY,

    Defendant.

Civil Action No. 09–1045 (CKK)

## MEMORANDUM OPINION
(March 30, 2010)

Plaintiff LTMC/Dragonfly, Inc. ("LTMC"), doing business as District Cab Association, brings this action against Defendant Metropolitan Washington Airports Authority ("MWAA") protesting its nonselection for a taxicab concession at Washington Dulles International Airport. LTMC alleges that MWAA did not follow a fair and open process in awarding concession contracts and contends that its bid should have been among the three selected for a three-year contract. MWAA has moved to dismiss LTMC's Complaint for lack of subject matter jurisdiction, arguing that LTMC does not have standing and that the federal statute providing jurisdiction for suits against MWAA does not authorize bid protest actions such as this case. MWAA alternatively moves to dismiss on the ground that LTMC's Complaint is barred by the doctrine of laches because LTMC waited almost 19 months after losing its final administrative protest to bring this action. MWAA also moves to dismiss LTMC's claims for damages on the ground that damages are not an authorized remedy under the Enabling Act. After MWAA filed its [7] Motion to Dismiss, LTMC filed an opposition, and MWAA filed a reply. Having

considered the parties' filings, the applicable authorities, and the record as a whole, the Court shall GRANT-IN-PART Defendant's Motion to Dismiss with respect to LTMC's claims for damages under the Enabling Act, DENY WITHOUT PREJUDICE-IN-PART with respect to the defense of laches, and DENY-IN-PART in all other respects.

## I. BACKGROUND

### A.    *Metropolitan Washington Airports Authority*

The Metropolitan Washington Airports Authority is a regional entity created by the Virginia General Assembly and the District of Columbia City Council for the purposes of operating two federally owned airports, Washington Dulles International Airport ("Dulles") and Ronald Reagan Washington National Airport.  The transfer of control of these airports from the federal government to MWAA was authorized by the Metropolitan Washington Airports Act of 1986 (the "Enabling Act"), Pub. L. No. 99-591, §§ 6001-12, 100 Stat. 3341-376 (1986) (codified as amended at 49 U.S.C. §§ 49101-112).  The Enabling Act authorized the Secretary of Transportation to enter into a fifty-year lease (the "Lease") with MWAA for the operation of the airports.  The Lease was executed on March 2, 1987, and control of the airports was transferred on June 7, 1987.  Compl. ¶ 18.

The Enabling Act requires the Lease to include certain provisions governing MWAA's operation of the airports.  *See* 49 U.S.C. § 49104.  One of these provisions states that "[i]n acquiring by contract supplies or services for an amount estimated to be more than $200,000, or awarding concession contracts, the Airports Authority to the maximum extent practicable shall obtain complete and open competition through the use of published competitive procedures."  *Id.* § 49104(a)(4).  The Lease incorporates this language, stating that MWAA "shall obtain, to the

maximum extent practicable, full and open competition through the use of published competitive procedures." Compl. ¶ 131 (quoting Lease § 11.D.) The Enabling Act also requires that MWAA's contracts be "awarded by procedures that follow sound Government contracting principles." *See* 49 U.S.C. § 49106(g). Another mandatory provision requires WMAA to develop a code of ethics and financial disclosure to ensure the integrity of decisions made by the board of directors and employees. 49 U.S.C. § 49104(a)(8). The Enabling Act prohibits members of the MWAA board and their families from having financial conflicts of interests with any enterprise that does business with MWAA. *See id.* § 49106(d).

In response to these requirements, MWAA developed a "Contracting Policies and Procedures Manual" (hereinafter, "Contracting Manual") and a "Code of Ethics." Compl. ¶ 21. The Contracting Manual sets forth MWAA's commitment to maximizing the competitive procurement process. *Id.* ¶ 22. The Contracting Manual provides that when competitive procedures are used for awarding contracts, the offers will be "evaluated and scored against predetermined evaluation criteria" and that MWAA will select the proposal with the greatest overall benefit in terms of the evaluation criteria. *Id.* ¶¶ 23-24. The Contracting Manual and the Code of Ethics both prohibit MWAA officials from having conflicts of interest with potential vendors. *See id.* ¶¶ 25-30.

The Enabling Act provides that "[t]he district courts of the United States shall have jurisdiction to compel the Airports Authority and its officers and employees to comply with the terms of the lease. An action may be brought on behalf of the United States by the Attorney

General, or by any aggrieved party." *See* Enabling Act § 6005(e), 100 Stat. 3341-381.[1]

B.      *The 2007 Taxicab Concession Contract*

MWAA enters into a variety of revenue-generating concession contracts to provide goods and services to airport users. Compl. ¶ 20. MWAA regulations prohibit taxicab drivers from attempting to pick up passengers at Dulles unless the taxicab driver's company has a contract with MWAA. *Id.* ¶ 31. Around January 12, 2007, MWAA issued a request for proposals ("RFP") seeking proposals from taxicab companies for a contract to operate the taxicab concession at Dulles. *Id.* ¶ 32. The RFP informed prospective offerors that up to three contracts would be awarded and that each contract would be for an initial period of three years, with two one-year extension options. *Id.* ¶ 33. The contracts were to be awarded on or about June 1, 2007. *Id.* The RFP set forth certain criteria by which the contract proposals would be evaluated: (1) Operations/Management Plan; (2) Financial Offer; (3) Industry Experience, Qualifications and Past Performance; and (4) Financial Ability to Perform. *Id.* ¶ 38. The RFP stated that Criterion 3 would be evaluated based on "depth of experience, qualifications, and past performance in taxicab or similar operations." *Id.* ¶ 40. Criterion 4 would be evaluated based on the offeror's "financial strength, financial resume, certified financial statements for the last two years, and other relevant financial information." *Id.* ¶ 41.

LTMC timely submitted a proposal in response to the RFP. Compl. ¶ 34. Prior to January 12, 2007, LTMC had been providing taxicab service at Dulles pursuant to a prior contract. *Id.* ¶ 36. LTMC also owned and operated a large fleet of taxicabs throughout the

_____

[1] The language in the second sentence of this subsection was codified so as to read "The Attorney General or an aggrieved party may bring an action on behalf of the Government." 49 U.S.C. § 49104(c).

Washington, D.C., metropolitan area. *Id.* ¶ 37. LTMC asserts that its service at Dulles and throughout the region had been outstanding. *Id.* ¶¶ 36-37. A total of nine proposals for the taxicab concession RFP were submitted to MWAA. *Id.* ¶ 43. Among the other offerors was Dulles Airport Taxi, Inc. ("DAT"), a Northern Virginia taxicab company whose president was Farouq Massoud. *Id.* ¶ 44. According to LTMC, Massoud had previously operated taxicab service at Dulles through a company called Washington-Dulles Transportation ("WDT"), which was the subject of numerous complaints about the quality of service provided. *Id.* ¶¶ 45-46. Ultimately, Massoud and WDT were ousted from providing tax service at Dulles, and MWAA concluded that Massoud owed approximately $1.2 million in fees, but WDT sought bankruptcy protection and never paid the money to MWAA. *Id.* ¶¶ 47-49.

LTMC alleges that Massoud told others that he was assured of being selected as one of the winning bidders for the RFP because of information he had obtained from a lobbyist he hired to advocate in support of DAT's bid. Compl. ¶ 54. LTMC claims that the lobbyist in question was Brian Moran, an attorney who also served in the Virginia House of Delegates. *Id.* ¶¶ 55-56. At the time, Moran was contemplating a campaign for Governor or Lieutenant Governor of Virginia, and LTMC alleges that Moran hired Mame Reiley, then-Chairman of the MWAA Board of Directors, as a fundraising consultant. *Id.* ¶¶ 57-60. LTMC claims that Mame Reiley was hired by Moran's political campaign in April 2007, while the Dulles taxicab concession proposals were before MWAA for consideration. Compl. ¶ 64. Reiley voted in favor of DAT's proposal and did not recuse herself from the evaluation process or the vote on the award. *Id.* ¶¶ 62, 117. LTMC alleges that MWAA improperly evaluated DAT's proposal and failed to take into account Massoud's troubled history. *See id.* ¶¶ 71-73, 75-79.

MWAA pared down the list of offerors to six finalists, whose proposals were evaluated by MWAA's Technical Evaluation Committee. Compl. ¶¶ 74-75. The Committee recommended that taxicab concession contracts be awarded to DAT and two other companies (not LTMC) based on their evaluation of the four criteria in the RFP. *Id.* ¶ 80. LTMC claims that the Committee's evaluations were "completely divorced from any consideration of the actual facts relevant to Criteria 1, 3 and 4 and reflect a process that was arbitrary, capricious, irrational and/or tainted by a conflict of interests or other improper factor(s) rendering the evaluation process unfair . . . ." *Id.* In August 2007, the Committee's recommendation went to the MWAA Board of Directors. *Id.* ¶ 81. On August 10, 2007, MWAA sent LTMC a letter indicating that its proposal had not been selected. *Id.* ¶ 82. The rejection meant that LTMC would have to terminate its existing taxicab services at Dulles once the new contract began. *Id.* ¶ 83. MWAA personnel advised LTMC that its proposal had been rejected for reasons including the use of "less than ideal grammar" and a low financial offer. *Id.* ¶ 90. LTMC claims that these reasons were "specious and pretextual." *Id.* ¶ 91.

LTMC pursued all administrative protests and appeals provided for under the RFP and the Contracting Manual. Compl. ¶ 86. Specifically, LTMC alleged that the selection process and decision were unfair and inconsistent with the MWAA's obligation to provide for full and open competition, that MWAA had improperly evaluated LTMC's proposal by failing to consider LTMC's excellent past performance and failing to take into account LTMC's status as the only District of Columbia taxicab operator. *Id.* ¶ 92. LTMC's protest was denied by MWAA on August 20, 2007, and subsequent appeals were rejected on September 24, 2007, and November 14, 2007. *Id.* ¶¶ 93, 95, 105.

In its Complaint, LTMC alleges that MWAA violated the terms of the Lease by failing to follow its published competitive procedures for full and open competition. *See* Compl. ¶¶ 131-38. LTMC further alleges that MWAA's actions violated the substantive provisions of the Enabling Act and violated MWAA's implied duty to fairly and honestly consider the proposals submitted in response to the RFP. *Id.* ¶¶ 139-49. LTMC seeks a declaratory judgment declaring that MWAA's evaluation and decision-making process with respect to the taxicab concession contract violated the Lease and the Enabling Act, an injunction directing MWAA to terminate and cease further implementation of the contract and to either award LTMC a contract, reevaluate the proposals originally submitted, or re-issue an RFP for the taxicab concession. *Id.* ¶ 138. In addition, LTMC seeks an award of damages for costs and other damages, including lost profits, sustained as a result of MWAA's conduct. *Id.*

## II. LEGAL STANDARD

### A. *Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1)*

A court must dismiss a case pursuant to Rule 12(b)(1) when it lacks subject matter jurisdiction. In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted); *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."). "At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be construed with sufficient liberality to afford all possible

inferences favorable to the pleader on allegations of fact." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005). In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), [a] plaintiff['s] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal citations and quotation marks omitted).

B.      *Motion to Dismiss Under Rule 12(b)(6)*

The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986). Instead, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556).

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994); *see also Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged."). However, as the Supreme Court recently made clear, a plaintiff must provide more than just "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1950. Where the well-pleaded facts set forth in the complaint do not permit a court, drawing on its judicial experience and common sense, to infer more than the "mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. *Id.* at 1950.

In evaluating a motion to dismiss under Rule 12(b)(6), the Court is limited to considering the facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *see also Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002) ("[W]here a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment.") (citing *Greenberg v. The Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999)).

# III. DISCUSSION

MWAA has moved to dismiss the Complaint on several grounds. First, MWAA contends that the Court lacks subject matter jurisdiction over this action because LTMC lacks standing and because the relevant jurisdictional statute does not apply to bid protests such as the one brought by LTMC. Second, MWAA contends that LTMC's action should be barred by the equitable doctrine of laches. Finally, MWAA argues that LTMC has failed to state a claim for relief under the Enabling Act. The Court shall consider each of these claims in turn.

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1)

MWAA asserts two bases for its motion to dismiss for lack of subject matter jurisdiction. First, MWAA contends that LTMC lacks standing because it is only challenging the contract awarded to DAT and it cannot show that it was next in line to receive a contract. Second, MWAA argues that this Court lacks jurisdiction under 49 U.S.C. § 49104(c) to hear a challenge to the contract award process as applied to LTMC. The Court shall consider each of these arguments, beginning with the statutory basis for jurisdiction in this case.

### 1. Jurisdiction Under the Enabling Act

The parties agree that the only proper basis for subject matter jurisdiction is provided by the Enabling Act, which provides that the district courts have jurisdiction "to compel [MWAA] and its officers and employees to comply with the terms of the lease." 49 U.S.C. § 49104(c).[2] LTMC asserts that there is jurisdiction under the Enabling Act because it is seeking to compel MWAA to comply with the provision in the Lease that requires MWAA to "obtain, to the

---

[2] Although LTMC alleged in the Complaint that jurisdiction is also premised on 28 U.S.C. § 1331, so-called "federal question" jurisdiction, the only applicable federal law is the Enabling Act.

maximum extent practicable, full and open competition through the use of published competitive procedures." MWAA argues that while the Enabling Act might authorize a challenge regarding MWAA's failure to adopt "competitive procedures," it does not confer jurisdiction over a claim to the application of the "competitive procedures" already established. *See* Def.'s Mem. at 15-18. Each party relies on a separate decision from the United States Court of Appeals to support its position: MWAA relies on *Metropolitan Washington Airports Authority Professional Firefighters Local 3217 v. Metropolitan Washington Airports Authority*, 159 F.3d 630 (D.C. Cir. 1998), and LTMC relies on *Washington-Dulles Transportation, Ltd. v. Metropolitan Washington Airports Authority*, 263 F.3d 371 (4th Cir. 2001).

In *Firefighters Local*, the question before the D.C. Circuit was whether the district court had jurisdiction to entertain a lawsuit brought by the firefighters' union claiming that MWAA had breached the Lease by failing to bargain collectively over the implementation of video surveillance at the Reagan National Airport fire station. *See* 159 F.3d at 631. The Lease required MWAA to adopt and maintain an employment code to ensure that the collective bargaining rights of formerly federal employees were protected. *See id.* MWAA thus adopted a Labor Code, subsequently ratified by the Virginia legislature, which provided that allegations of unfair labor practices would be submitted to an Unfair Labor Practices Panel whose decisions would be reviewable by Virginia courts. *Id.* The Labor Code also gave the Virginia courts jurisdiction to hear a complaining party's petition for enforcement of the Panel's decision. *Id.* The firefighters' union submitted a charge to the Panel, which ruled that MWAA had violated the Labor Code by failing to bargain collectively over the video surveillance. *Id.* Before MWAA could appeal to a Virginia court, the union brought an action in this District to enforce the Panel's decision. *Id.*

11

The union then amended its complaint to include a claim that the refusal to bargain constituted a violation of the Lease.  *Id.* at 632.  The D.C. Circuit held that the district court lacked jurisdiction over the union's claim.  *Id.*  The court emphasized that the union was not challenging the validity of the Labor Code or the validity of the provision granting jurisdiction to the Virginia courts to review the Panel's disposition of unfair labor practice claims.  *Id.*  The court acknowledged that "the interrelationship between federal and Virginia jurisdiction and substantive law under the [Enabling] Act is certainly peculiar, and more than a little puzzling."  *Id.* at 633.  Ultimately, the court ruled that "the federal/local balance implicit in the Act is best honored by allocating to Virginia courts jurisdiction to review challenges to the application of the Code and to federal district courts jurisdiction over facial challenges to the Code (as violations of the lease)."  *Id.*

The D.C. Circuit's ruling in *Firefighters Local* was explicitly distinguished by the Fourth Circuit in *Washington-Dulles Transportation* ("*WDT*").  *See* 263 F.3d at 376-77.  The issue in *WDT* was identical to the issue presented in this case: whether the federal courts have jurisdiction to hear a challenge to MWAA's compliance with competitive bid procedures.  *See id.* at 376.  The court began by noting that the jurisdictional language in the Enabling Act is broad, covering all actions to compel MWAA "to comply with the terms of the lease."  *Id.*; 49 U.S.C. § 49104(c).  The court went on to conclude that WDT's claim—that MWAA failed, as in this case, to "obtain complete and open competition through the use of published competitive procedures" as required by the Enabling Act and the Lease—alleges a failure to comply with the terms of the Lease.  263 F.3d at 376.  The court explained that "[t]he Enabling Act and the Lease require MWAA to *use* published competitive procedures, not merely put them on paper.  Federal jurisdiction over the enforcement of the Lease is consistent with the continuing federal interest in the airport."  *Id.*

The court went on to explain that although both D.C. and Virginia law provide a forum for general contract claims against MWAA, they exempt MWAA from their procurement statutes and do not specifically provide a cause of action to compel WMAA to comply with its duties under the Lease. *Id.* The Enabling Act fills this gap by providing a cause of action in federal court to enforce open and competitive bidding, without which the Enabling Act's provisions "would be a hollow and toothless promise." *Id.* The *WDT* court distinguished *Firefighters Local* as dealing with a violation of "a state labor code, which had its own detailed enforcement mechanism"—an impediment that the *WDT* court did not face. *Id.* at 377.

MWAA barely makes note of the *WDT* decision in its briefs, noting only that it is not binding precedent on this Court. Instead, MWAA contends that LTMC is bringing the same sort of "as-applied" challenge that was insufficient to invoke federal jurisdiction in *Firefighters Local*, which is binding precedent. However, the Court finds that, as in *WDT*, MWAA reads too much into *Firefighters Local*. *See* 263 F.3d at 377. Although there is certainly language in *Firefighters Local* that suggests this Court lacks jurisdiction over any as-applied challenges, that case involved a competing jurisdictional provision that is not present here. This Court is persuaded by the reasoning of the *WDT* court that the Enabling Act provides jurisdiction for a disappointed bidder to challenge the MWAA's application of competitive bidding procedures that are required by the Lease. Accordingly, the Court rejects MWAA's interpretation of the jurisdictional provision in the Enabling Act.

### 2. LTMC's Standing

MWAA next contends that LTMC lacks standing to bring this action. The "irreducible constitutional minimum of standing contains three elements": (1) injury in fact, (2) causation,

and (3) redressability.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  First, the injury must be "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  *Id.* at 560 (internal quotation marks and citations omitted).  Second, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id.* (internal quotation marks and alterations omitted).  Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'" from the court.  *Id.* at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).  MWAA's standing argument is twofold.  First, MWAA argues that LTMC was not "next in line" to receive a contract and therefore it could not have been injured by any alleged bias in favor of DAT.  Second, MWAA argues that LTMC is not entitled to relief that would redress its injury because MWAA was not required to award a third contract or to award a new contract based on now-expired offers.

According to MWAA, LTMC's bid ranked fifth out of the six finalists for three possible contracts, and therefore, even if DAT's bid were thrown out, LTMC would not have been awarded a contract.  *See* Def.'s Mem. at 14.[3]  Relying on *Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 540 F. Supp. 2d 66 (D.D.C. 2008), MWAA argues that in order to succeed with its bid protest, LTMC must establish "significant prejudice," meaning that there was a "substantial chance" it would have received the contract award but for the alleged misconduct, which is demonstrated when it is "next in line" for the award.  *See id.* at 76-77.  However,

---

[3] Defendant supports this assertion with evidence attached to its motion to dismiss.  *See* Def.'s Mem., Ex. 2 (Report to the MWAA Board of Directors).  This evidence may be considered by the Court when determining whether the Court has subject matter jurisdiction.

*Monument Realty* did not address the issue of standing; rather, it focused on the merits of the plaintiffs' challenge in the context of a motion for a preliminary injunction. *See id.* Whether a plaintiff has a cause of action goes to the merits of the case, and the merits must be assumed when considering standing. *Vietnam Veterans of Am. v. Shinseki*, __ F.3d ___, 2010 WL 986485, at *3 (D.C. Cir. Mar. 19, 2010). Here, the question is whether LTMC has suffered a legally cognizable injury as a result of the misconduct alleged in the Complaint.

MWAA construes the allegations in LTMC's Complaint as pertaining solely to the issue of bias in the awarding of a contract to DAT. However, LTMC contends that its challenge is broader than that, and several paragraphs in the Complaint support a broader reading. For example, LTMC alleges that

> MWAA failed in the evaluation process to adequately and appropriately consider the excellent past performance and otherwise demonstrated ability at Dulles and elsewhere of the Plaintiff to provide the best managed and operated taxicab concession at the highest levels of service to the public, which purportedly was to be an overriding factor guiding the authorities [sic] intent in the contracting evaluation process.

*See* Compl. ¶ 92(E). LTMC also alleges that

> MWAA's decision on the contract award[] reflected evaluations completely divorced from any consideration of the actual facts relevant to Criteria 1, 3 and 4 and reflect a process that was arbitrary, capricious, irrational and/or tainted by a conflict of interests or other improper factor(s) rendering the evaluation process unfair and violating the requirements under the Lease and other relevant regulations that the contract award process be an open and fair competition and consistent with sound government contracting principles.

*Id.* ¶ 80. These allegations are sufficient to make out a claim challenging the entire process by which the MWAA awarded the taxicab concession contracts.[4]

---

[4] It is true that the majority of LTMC's allegations pertain to the alleged bias toward DAT and that the relief sought in the Complaint includes a declaratory judgment that MWAA's award

Viewing LTMC's Complaint more broadly as a challenge to the openness and fairness of the bid evaluation process, it becomes clear that LTMC has standing to bring this action. The Enabling Act provides standing to any "aggrieved party" to compel the MWAA to comply with the terms of the Lease. In this respect, the Enabling Act is similar to the Administrative Procedure Act, which confers standing on "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute. . . ." 5 U.S.C. § 702. In *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970), the D.C. Circuit extensively analyzed the issue of standing in the government contracts context and held that frustrated bidders have standing under the APA to challenge alleged illegalities in the awarding of government contracts. *See id.* at 872-73. The D.C. Circuit has since explained that "[a] disappointed bidder that claims illegality in a procurement alleges an injury beyond its economic loss of the contract. The disappointed bidder may also claim injury to its right to a legally valid procurement process." *Nat'l Maritime Union of Am. v. Commander, Military Sealift Command*, 824 F.2d 1228, 1237 (D.C. Cir. 1987). Thus, "injury to a bidder's right to a fair procurement is obviously an injury both traceable to the alleged illegality in a procurement and redressable by any remedy that eliminates the alleged illegality." *Id.* at 1237-38; *see also Free Air Corporation v. FCC*, 130 F.3d 447, 450 (D.C. Cir. 1997) ("Th[e]se cases make clear that a disappointed bidder whose own application was within the zone of active consideration may seek judicial vindication of its right 'to have its bid considered solely on the

---

to DAT violated the Lease and the Enabling Act and an injunction terminating DAT's contract. *See* Compl., Request for Relief ¶¶ 1-2. However, LTMC also asks for a reevaluation of the bids submitted under the RFP according to the criteria in the Lease, the RFP, and all other appropriate criteria. *See id.* ¶ 2.

merits.'") (quoting *National Maritime Union*, 824 F.2d at 1237). Because the Enabling Act specifically requires MWAA to follow open and competitive contracting procedures, it logically follows that a losing bidder would qualify as an "aggrieved party" who may bring a challenge to ensure compliance with the Lease.

MWAA's second argument is that LTMC's injury is not redressable by the court because MWAA was not required to award three contracts and the bids originally submitted have long since expired. *See* Def.'s Mem. at 14-15. However, that argument misunderstands the redressability requirement. The redressability element of standing "is virtually always merely the reciprocal of causation." *Vietnam Veterans*, 2010 WL 986485 at *3. "As a separate element, it is implicated only when the court's power to redress an injury caused by an illegal act is independently impaired." *Id.* (citing *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007)). This is not a case in which the injury to the plaintiff is caused directly by a third party who is not before the Court. *See, e.g.*, *Renal Physicians Ass'n*, 489 F.3d at 1276. MWAA incorrectly implies that the Court lacks authority to enjoin MWAA to re-conduct a fair contracting process that complies with the Lease. Such relief is clearly contemplated by the Enabling Act. *See* 49 U.S.C. § 49104(c) ("The district courts of the United States have jurisdiction to compel the Airports Authority and its officers and employees to comply with the terms of the lease.") Therefore, MWAA's standing arguments fail, and the Court finds that it has subject matter jurisdiction over LTMC's Complaint.

B. *Laches*

MWAA argues that LTMC's complaint should be barred by the equitable doctrine of laches. "Laches is founded on the notion that equity aids the vigilant and not those who slumber

17

on their rights." *NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131, 137 (D.C. Cir. 1985). The defense of laches "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 47 (D.C. Cir. 2005) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002)). "Laches does not depend solely on the time that has elapsed between the alleged wrong and the institution of suit; it is 'principally a question of the inequity of permitting the claim to be enforced–an inequity founded upon some change in the condition or relations of the property or the parties.'" *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C. Cir. 1982) (quoting *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892)). "Whether the doctrine bars an action in a particular case depends upon the circumstances of that case." *Id.*

MWAA contends that there was a lack of diligence of LTMC's part because it did not bring this action until more than eighteen months after losing its final administrative appeal, by which time the three-year initial contract period was close to half completed.[5] LTMC denies that it was "sleeping on its rights," noting that it vigorously protested its bid for several months after learning that its bid was rejected.[6] However, LTMC does not provide a clear explanation as to why it waited more than 18 months after losing its final protest appeal to bring this action. In its opposition, LTMC suggests there was a "continuing investigation of the claims" during this time period and that there were "representations made to Plaintiff's owners by MWAA Board

---

[5] The pleadings do not indicate when the new contracts actually began, but LTMC asserts that it was "months after the final protest appeal was decided," Pl.'s Opp'n at 4, which would be in early 2008.

[6] It also appears that LTMC threatened that it may pursue litigation if its appeal was denied. *See* Letter from Jeffrey Schaeffer, LTMC Vice President, to Philip Sunderland, MWAA Vice President and Secretary (Oct. 3, 2007) (attached as Exhibit 5 to Def.'s Mem.) at 5.

members and others, concerning efforts to get Plaintiff relief without the need for a lawsuit." *See* Pl.'s Opp'n at 4. Without any supporting evidence, these explanations would not seem to justify an 18-month delay in filing a challenge to the award of a three-year contract. If LTMC needed to conduct additional investigation into possible improprieties in the bid selection, it could easily have done so through discovery in a promptly filed federal action. And if LTMC chose to forego filing a federal lawsuit in order to pursue other possible avenues for relief, it apparently made a voluntary decision to do so, as there are no allegations of coercion before the Court.

In the bid protest context, time is of the essence. *See Jones & Artis Constr. Co. v. D.C. Contract Appeals Bd.*, 549 A.2d 315, 319 (D.C. 1988) ("Customarily, complaints about the solicitation and award of contracts . . . must be quickly asserted and expeditiously resolved so that the contract can be awarded and the job begun.") This principle is reflected most prominently in state and federal government bid protest regulations, which generally require that protests be filed within a very short time period after discovering the basis for the protest. *See* 4 C.F.R. § 21.2 (10 days); Va. Code Ann. § 2.2-4360 (2009) (10 days); *see also* Model Code for Public Infrastructure Procurement § 9-108 (2007) (prescribing that protests be brought in court within 14 days of a final administrative decision or within 30 days of discovering the facts giving rise to the protest). Although these provisions are not directly applicable here, and although LTMC did file a timely administrative protest, equity dictates in such circumstances that a bidder seeking to pursue further remedies do so in a reasonably expeditious manner. *See, e.g.*, *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) ("Equity demands that those who would challenge the legal sufficiency of administrative decisions concerning time

sensitive public construction projects do so with haste and dispatch.")[7]; *Birmingham Realty Co. v. Gen. Servs. Admin.*, 497 F. Supp. 1377, 1390-91 (N.D. Ala. 1980) (holding that a two-month delay was sufficient for laches defense where bidder was aware of time constraints). Based on the pleadings alone, it appears that the first prong of the laches inquiry is satisfied in this case by LTMC's nearly nineteen-month delay.

With respect to the second prong of the inquiry, there are two types of prejudice that can support a laches defense: trial prejudice and economic prejudice. *Gull Airborne*, 694 F.2d at 844. MWAA does not claim that it has lost any witnesses or evidence that would prejudice a possible trial; its only asserted prejudice is economic. Specifically, MWAA contends that it would be prejudiced if it were required to go through the time and expense of a reprocurement where the initial term of the contract to be reprocured is more than half completed. *See* Def.'s Mem. at 9. MWAA argues that the initial term of the contract may very well be completed by the time this litigation is over and that conducting a competition for the limited remaining term of the contract would be prejudicial because offerors would be unlikely to submit attractive bids for such a limited contract term. *See id.* However, LTMC's claim is not yet moot, and there is no evidence in the record to support MWAA's suggestion that new offers would be unsatisfactory. MWAA also contends that LTMC's delay has increased the costs of conducting a reprocurement because it will now be much more difficult to get the offerors to extend their

---

[7] *Quince Orchard* did not specifically involve the application of laches, but it cited laches principles as relevant to the question of whether unreasonable delay justified denying a preliminary injunction to stop further construction on a highway project. *See* 872 F.2d at 79-80.

initial bids than it would have been in November 2007 when LTMC's final appeal was denied.[8]
*See* Def.'s Reply at 9-10. That may be true, but MWAA has provided no specific evidence in support of this assertion. MWAA also refers to the prejudice to the other taxicab companies whose concession contracts might be rescinded as a result a reprocurement. *See* Def.'s Mem. at 9-10. However, they are not parties to this action, and MWAA fails to explain precisely how such a rescission would impact MWAA financially.

Ultimately, "the circumstances of any delay or the prejudice suffered by the defendant is fundamentally a factual inquiry." *Major v. Plumbers Local Union No. 5*, 370 F. Supp. 2d 118, 128 (D.D.C. 2005). Where that inquiry requires facts not in the pleadings, the defense of laches should not be resolved on a motion to dismiss. *Id.*; *see also Nat'l Treasury Employees Union v. Whipple*, 636 F. Supp. 2d 63, 77 (D.D.C. 2009) (denying laches claim where defendant failed to show specific evidence of unreasonable delay and undue prejudice). Accordingly, the Court finds that although MWAA may have a valid laches defense, it is premature to conclude that laches bars this action based on the present record. MWAA may renew its laches argument in a subsequent motion based on a more thorough demonstration of how it has been unfairly prejudiced by LTMC's delay in bringing this action.

C.    *Motion to Dismiss for Failure to State a Claim upon Which Relief Can Be Granted under Rule 12(b)(6)*

MWAA contends that LTMC's Complaint must be dismissed because it construes the

_____

[8] MWAA unpersuasively argues that prejudice exists because the initial offers submitted for the contract expired 180 days following the date of submission, which was in March 2007. *See* Def.'s Mem. at 8. However, this means offers would have expired in September 2007, before LTMC's administrative appeal was completed, so some sort of resubmission of offers would have been necessary even if LTMC had filed a timely lawsuit.

Enabling Act as requiring that actions be brought "on behalf of the Government," while LTMC is seeking to vindicate only its own corporate interests. Additionally, MWAA argues that the Enabling Act does not authorize a cause of action for damages. The Court shall address each of these contentions.

1.    Claims Brought on Behalf of the Government

The Enabling Act, as codified at 49 U.S.C. § 49104(c), states that "[t]he Attorney General or an aggrieved party may bring an action on behalf of the Government." MWAA reads this provision to mean that the Enabling Act does not provide a cause of action to private parties who are suing MWAA to further their own private interests because such claims are not brought "on behalf of the Government." *See* Def.'s Mem. at 18-19. Although this construction of the statute might be unwieldy in practice (how does one distinguish claims brought on one's own behalf from those brought on behalf of the Government?), it is not an implausible reading of the text. However, as the Fourth Circuit explained in *WDT*, the language of the statute was different when it was enacted and was modified during codification. *See* 263 F.3d at 377-78. The original language read: "An action may be brought on behalf of the United States by the Attorney General, or by any aggrieved party." Enabling Act, § 6005(e), 100 Stat. 3341-381. Where there is a discrepancy between the language in the United States Code and the Statutes at Large, the language in the Statutes at Large controls. *WDT*, 263 F.3d at 378. The original language of the statute makes MWAA's interpretation of the statute less plausible. In *WDT*, the Fourth Circuit conducted a thorough analysis of the original language and concluded that the Enabling Act allows an "aggrieved party" to bring an enforcement action in its own right and allows the Attorney General to bring such an action on behalf of the Government. *Id.* This Court is

persuaded by the Fourth Circuit's analysis of this issue and therefore concludes that LTMC may sue on its own behalf to enforce the Lease. Accordingly, LTMC's Complaint should not be dismissed on this basis.

2.      Claims for Damages

In addition to equitable relief, LTMC seeks certain damages, including its bid preparation costs, costs associated with its termination and re-establishment of taxi services at Dulles, lost business revenue and profits, and protest costs including attorneys' fees and other expenses. *See* Compl., Request for Relief ¶ 3. However, Section 49104(c) provides jurisdiction only "to compel [MWAA] and its officers and employees to comply with the terms of the lease." 49 U.S.C. § 49104(c). The plain language of § 49104 limits the remedies available to equitable relief necessary to enforce compliance with the Lease. "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979). Therefore, the Court finds that LTMC's claims for damages are not authorized by the Enabling Act and must be dismissed.[9]

## IV.  CONCLUSION

For the foregoing reasons, the Court shall GRANT-IN-PART Defendant's [7] Motion to Dismiss with respect to any claims for damages, DENY WITHOUT PREJUDICE-IN-PART with

---

[9] The Court also notes that LTMC failed to address in its opposition MWAA's argument that damages were unavailable as a remedy. Therefore, the Court alternatively may treat this argument as conceded. *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.")

respect to the defense of laches, and DENY-IN-PART in all other respects. An appropriate

Order accompanies this Memorandum Opinion.


Date:   March 30, 2010


                                    _____/s/_____
                                    COLLEEN KOLLAR-KOTELLY
                                    United States District Judge